**COLOR PIGMENTS MANUFACTURERS ASSOCIATION, INC., (f/k/a Dry Color Manufacturers' Association), Petitioner,**

**The Cadmium Council, Inc., Intervenor,**

v.

**OCCUPATIONAL SAFETY & HEALTH ADMINISTRATION, Robert Reich, U.S. Secretary of Labor, Respondents.**

No. 92–3057.

United States Court of Appeals, Eleventh Circuit.

March 22, 1994.

Harold F. Fitzpatrick, Fitzpatrick & Israels, Secaucus, NJ, for Color Pigments Mfrs. Assoc.

Edwin H. Seeger, Jane Luxton and J. William Doolittle, Prather, Seeger, Doolittle & Farmer, Washington, DC for Cadmium Council, Inc.

Barbara Werthmann and Charles F. James, Office of the Sol. of Labor, Dept. of Labor, Washington, DC for Dept. of Labor.

Before BIRCH, Circuit Judge, RONEY* and CLARK, Senior Circuit Judges.

BIRCH, Circuit Judge:

This case arises from passage by the Occupational Safety and Health Administration (OSHA) of a standard governing occupational exposure to cadmium, promulgated at 57 Fed.Reg. 42101 (Sept. 14, 1992) ("Final Rule"). We find that OSHA presented substantial evidence to justify including cadmium pigments in this standard, which calls for a permissible exposure limit (PEL) of 5 micrograms per cubic meter (5 $\mu$g/m$^3$), measured as an eight hour time weighted average. We find, however, that OSHA failed to present substantial evidence supporting its conclusion that the PEL was technologically and economically feasible for the dry color formulator industry absent a Separate Engineering Control Air Limit (SECAL). We therefore REVERSE OSHA's findings on this issue and REMAND for a determination of the technological and economic feasibility of the standard as it applies specifically to the dry color formulator industry, and a finding as to the need for a SECAL in that industry.

* *See* Rule 34–2(b), Rules of the U.S. Court of

## I. BACKGROUND

Cadmium pigments are particular forms of cadmium compounds, usually cadmium sulfide or cadmium selenium. Cadmium pigments are vivid coloring agents in the yellow to red range which have several unique properties making them particularly useful in a variety of areas, including ceramics, aerospace, and plastics. Cadmium pigment manufacturers create these pigments in the form of a powder which is sold to, among others, dry color formulators. Dry color formulators mix the powders in a matrix, creating specific color combinations, generally made to order, and package them in a form usable by their customers, often in pellet shape. The cadmium exposure after the pigments are in the pellet or other encapsulated form is minimal. However, dry color formulators experience exposure during the mixing and encapsulating processes.

On September 14, 1992, OSHA issued a standard for exposure to cadmium applicable to a broad range of industries and a large number of compounds which contain cadmium. Pursuant to 29 U.S.C. § 655(f), this standard was challenged in the United States Court of Appeals for the Fourth Circuit. On October 19, 1992, in accordance with an order of the Judicial Panel on Multidistrict Litigation issued pursuant to 28 U.S.C. § 2112(a)(3), the petition was transferred to this court.

The principal party before us in this multidistrict litigation, the Color Pigments Manufacturers Association, Inc. (CPMA), challenges the standard on two grounds. First, CPMA asserts that the inclusion of cadmium pigments in the standard applicable to all other cadmium compounds is not supported by substantial evidence, as the pigments have not been shown to be as toxic or carcinogenic as other, more soluble, cadmium compounds. Second, CPMA takes issue with OSHA's determination that the dry color formulator industry would be technologically and economically capable of meeting the PEL without the need for a SECAL, which has been afforded to other cadmium users. We examine each argument in turn.

Appeals for the Eleventh Circuit.

## II.  DISCUSSION

*A.  Standard of Review*

In this case our task is the review of an administrative agency's decision-making process and conclusions.  As such, it requires that we not only analyze the law used by OSHA, but also directly review the sufficiency of the evidence presented and the procedure used in promulgating the standard.  In addressing the challenge to the Final Rule we must determine the applicable standard of review, which dictates the degree of deference we will give to the conclusions of OSHA in creating the PEL and determining its feasibility, and then apply that standard of review.

■ As it relates to judicial review of agency decisions, the Occupational Safety and Health Act provides: "The determinations of the Secretary [of Labor] shall be conclusive if supported by substantial evidence in the record considered as a whole." 29 U.S.C. § 655(f).  The Supreme Court has stated that "[i]n statutes with provisions virtually identical to § 6(f) of the [Occupational Safety and Health] Act, we have defined substantial evidence as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *American Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 522, 101 S.Ct. 2478, 2497, 69 L.Ed.2d 185 (1981) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951)).  This language does not mean that OSHA must prove that there is but one possible conclusion.  The existence of a viable alternative does not preclude the acceptance of an agency determination as supported by substantial evidence.  All that need be shown is that OSHA's determination is supported by evidence presented to or produced by it and does not rest on faulty assumptions or factual foundations.

■ Nevertheless, while the standard is not so stringent as a preponderance of the evidence test, it does require us to " 'take a

"harder look" at OSHA's action than we would if we were reviewing the action under the more deferential arbitrary and capricious standard applicable to agencies governed by the Administrative Procedure Act.' " *AFL–CIO v. OSHA*, 965 F.2d 962, 970 (11th Cir. 1992) (quoting *Asbestos Info. Ass'n v. OSHA*, 727 F.2d 415, 421 (5th Cir.1984)).  We must look at the OSHA standard and the evidence supporting it, and we will " 'uphold the agency's "choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." ' " *Id.* (quoting *AFL–CIO v. Marshall*, 617 F.2d 636, 649 n. 44 (D.C.Cir.1979) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. at 488, 71 S.Ct. at 464–65)).  Hence, we examine the process and evidence used by OSHA in determining the similarity of cadmium pigments to other cadmium compounds, and the technological and economic feasibility of the standard, with an eye toward discerning facts sufficient to support its eventual decision.

*B.  The Dry Color Formulator Industry*

■ This case is brought by CPMA on behalf of dry color formulators in the United States.  CPMA nominally represents the pigment manufacturers.  However, these manufacturers have dry color formulators as the primary purchasers of their pigments. CPMA argues that these dry color formulators are too small and unorganized to raise a challenge themselves.[1]

The dry color formulator industry combines raw pigments in a matrix of other materials to form color combinations for specific customers, primarily on a made to order basis.  Dry color formulators purchase the pigments from pigment manufacturers in dry bulk form and blend them to form the desired colors.  In the process of such blending the workers in dry color formulator plants are exposed to cadmium pigment dust through inhalation.

**1.** Standing of CPMA was discussed briefly at oral argument.  We find that CPMA's members have standing due to the significant effect on their interests created by a threat to the existence of

the dry color formulator industry.  *See Craig v. Boren*, 429 U.S. 190, 192–93, 97 S.Ct. 451, 454, 50 L.Ed.2d 397 (1976) (standing based on vendor's assertion of vendee's rights approved).

## C. Inclusion of Cadmium Pigments in the Standard

■ OSHA created a standard PEL of 5 $\mu g/m^3$ applicable to all cadmium compounds, including cadmium pigments. CPMA argues that the evidence is insufficient to support the inclusion of cadmium pigments in the PEL, as they are less soluble, and therefore less toxic and carcinogenic, than other forms of cadmium. We disagree. As mentioned above, the standard of review here directs us to determine whether OSHA's decision has a rational basis, not whether we would have reached a different decision *de novo*. The existence of a viable alternative viewpoint is not enough to invalidate OSHA's decision if that decision is itself reasonable and supported by evidence in the record.

In this case we believe that OSHA has presented evidence sufficient to justify inclusion of cadmium pigments in the PEL. OSHA appeared to rely originally on the Fraunhofer study, which showed a dose-response relationship between cadmium pigment exposure and cancer. However, that study was later called into question when it was shown that the cadmium pigment employed, cadmium sulfide, was exposed to light and water simultaneously, thereby converting some or all of the cadmium sulfide to a far more soluble compound, cadmium sulfate. Despite this doubt as to the reliability of the Fraunhofer study, OSHA asserted that factors other than the solubility of a cadmium compound could have an effect on cancer and disease rates. For example, OSHA argues that the amount of time the cadmium spends in the body, which increases as the solubility decreases (chronic, as opposed to acute, exposure), is an important factor.

We are not in a position to reach an authoritative decision as to discrete scientific arguments, and the Occupational Safety and Health Act does not require us to do so. Rather, we must only decide whether OSHA acted with a rational basis and on substantial evidence in reaching its determination. No definitive study confirming or refuting the hypothesis that cadmium pigments are equally as toxic and carcinogenic as other cadmium compounds has been presented to us. Given the absence of definiteness on the is-

sue, the volume of evidence that points at least implicitly to the dangers of cadmium pigments, and the serious potential health risks present if cadmium exposure is as great in pigment form as in other compounds, we believe that OSHA was justified in choosing to include cadmium pigments in the PEL, despite the existence of an equally rational alternative.

## D. The Basis for OSHA's Determination of Feasibility

■ OSHA, in its rulemaking, determined that the PEL of 5 $\mu g/m^3$ was technologically and economically feasible for the dry color formulator industry. Although feasibility need not be shown with scientific certainty, "the burden is on OSHA to show by substantial evidence that the standard is feasible." *AFL–CIO v. OSHA*, 965 F.2d at 980. OSHA asserts that its testing and research were sufficient to show both the technological and economic feasibility of the standard. However, its grouping of the dry color formulator industry with other users of cadmium pigments and its failure to study any particular dry color formulators whatsoever show that OSHA proceeded generically rather than making the requisite specific findings for this identifiable industry segment. Hence, its findings are without the substantial support necessary to show the feasibility of the PEL of 5 $\mu g/m^3$ without a SECAL in this industry.

### 1. Technological Feasibility

■ Technological feasibility exists when the PEL can be met with engineering and work practice controls.

To show that a standard is technologically feasible, OSHA must demonstrate "that modern technology has at least conceived some industrial strategies or devices which are likely to be capable of meeting the PEL and which the industries are generally capable of adopting." Further, "the undisputed principle that feasibility is to be tested industry-by-industry demands that OSHA examine the technological feasibility of each industry individually."

*Id.* (citation omitted) (quoting *United Steelworkers of Am. v. Marshall*, 647 F.2d 1189, 1266, 1301 (D.C.Cir.1980), *cert. denied*, 453

U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981)). Here, OSHA failed to meet this test from the start.

■ In determining the technological feasibility of meeting the PEL in the dry color formulator industry, OSHA first determined the existing airborne levels of cadmium in the industry. However, the method OSHA employed in doing so was inadequate. Rather than analyzing exposure levels in the dry color formulator industry, OSHA analyzed such exposures generically. The first method used by OSHA was to group dry color formulators with other industries where workers mix chemicals. Secondly, OSHA analyzed exposure levels at two large companies that used cadmium pigments, Hoechst Celanese and Rubbermaid. The reliability and probative value of such comparisons would depend on the similarities the analyzed industries bore to the dry color formulator industry and the extent of significant differences.

Based on the use of these models, OSHA determined "that [pre-standard] exposure levels [in the dry color formulator industry] were below 20 μg/m³ with means near 10 μg/m³." Final Rule, 57 Fed.Reg. 42102, 42300 (1992). In contrast, OSHA determined, in several direct studies of cadmium pigment *manufacturers,* that the pre-standard exposure levels for that industry varied significantly among the tasks of each employee, ranging from as little as 6 μg/m³ to well over 100 μg/m³. *See Id.* at 42255. OSHA determined that it was technologically infeasible for the pigment *manufacturing* industry to meet the PEL absent a SECAL. It determined that it would be feasible for the manufacturers to reduce cadmium exposure in the 60 to 80 percent range. *Id.* at 42263. This reduction would result in exposure levels in excess of the PEL, necessitating the application of a SECAL to this industry.

In the case of the dry color *formulator* industry,

OSHA found the standard technologically feasible because (1) a substantial percentage (approximately 50%) of chemical mix-

ing exposures were already below the PEL; (2) some formulators that used cadmium pigments intermittently could avoid the need to implement engineering and work practice controls by regulating their use of cadmium to come within the 30–day exclusion; and (3) additional feasible controls could further reduce exposure levels.

Appellee Brief at 51–52 (footnote omitted); *see* Final Rule, 57 Fed.Reg. at 42304. According to OSHA, these methods can reduce exposures by 60 to 80 percent, the same percentage reduction applied to the manufacturers. However, in this case, such a percentage reduction, assuming a starting mean exposure of 10 μg/m³, would reduce the exposure level to a point below the PEL. In order for this analysis to be valid, the starting point, the pre-standard exposure levels in the dry color formulator industry, must be shown to be accurate.

In this case, OSHA lacks substantial evidence to demonstrate the accuracy of the pre-standard exposure levels it asserts. Its first method of analysis was a study by JACA corporation, commissioned by OSHA, which included workers in the dry color formulator industry in its chemical mixer category. *See Id.* at 42299–304. We believe the operations studied are insufficiently similar to establish the exposure levels to which workers in the dry color formulator industry are exposed. Chemical mixers, under JACA's definition, do indeed engage in processes similar or even identical to those of workers in the dry color formulator industry. However, the exposure level of any worker depends on several variables which may very well differ among mixers. For example, exposure levels depend not only on the task undertaken by an employee, but also on the frequency with which that task involves the use of cadmium pigments. The use of the Hoechst Celanese and Rubbermaid studies is insufficient and unreliable for the same reason—these are large corporations whose activities, and therefore sources of and opportunities for exposure, are far more diverse than those of a typical dry color formulator.[2]

2. It is important to note that we are not determining that OSHA's findings as to pre-standard exposures are incorrect. Rather, we hold that

the analytical method employed by OSHA was too broad to sufficiently support OSHA's findings.

OSHA's analysis here relies on its determination of the starting exposure level. Its conclusion as to the feasibility of reducing these levels below the PEL is by method of a percentage reduction from the initial levels. For this reason, the initial levels are vital. In this case, the method of determining these initial levels was unreliable and insufficient, since the workers and plants to which the dry color formulator industry was analogized were not shown to be sufficiently similar to justify such a comparison. OSHA employed the flawed and prohibited method of analyzing these pre-standard exposure levels generally, rather than specifically to the industry in question here. *See AFL–CIO v. OSHA,* 965 F.2d at 980.[3]

2.  Economic Feasibility

In order to demonstrate economic feasibility,

> OSHA must "provide a reasonable assessment of the likely range of costs of its standard, and the likely effects of those costs on the industry," so as to "demonstrate a reasonable likelihood that these costs will not threaten the existence *or competitive structure* of an industry, even if it does portend disaster for some marginal firms."

*AFL–CIO v. OSHA,* 965 F.2d at 982 (citation omitted) (emphasis added) (quoting *United Steelworkers of Am. v. Marshall,* 647 F.2d at 1266, 1272). Essentially, OSHA's economic feasibility findings here suffer from the same deficiencies as its findings of technological feasibility. If it is incorrect in its determination of the pre-standard exposure levels for the dry color formulator industry, then it will undoubtedly cost more for each firm to reduce exposures to the PEL, absent a SECAL.

Any increase in cost not anticipated by OSHA must be absorbed somewhere in the industry. The data before this court shows the industry to be comprised of many small concerns, with minimum ability to absorb significant capital outlays, and with even less ability to spread such expenditures among its customers in the form of price increases. Of primary concern is the current existence of more cheaply priced imported colors from foreign dry color formulators. OSHA asserts, without support in either research or common sense, that customers of dry color formulators would prefer to pay more for their supply of colors from local, domestic formulators than pay less for imported products. Even if this is currently true as it relates to the relatively small price difference between domestic and imported colors, there is no reason to assume that these customers will be willing, or even fiscally able, to absorb the more substantial increase which may be necessitated by a large outlay in meeting the PEL.

Additionally, there is evidence that the overall market for these cadmium pigment based colors has decreased by as much as 35% over the past several years, for both domestic and imported products. Record Excerpts, Vol. II, Tab 15, p. 2. The lag in the market for these products will make the distribution of any capital outlays through cost increases significantly less feasible. Moreover, OSHA asserted in its own findings that "the targeted level of 5 $\mu g/m^3$ will be difficult to achieve for many plants in [the dry color formulator] sector." Final Rule, 57 Fed.Reg. at 42304. Although OSHA found it feasible on balance, this estimate of difficulty will be exacerbated if it is shown that the pre-standard exposure levels employed by OSHA were inaccurate. Therefore, we hold that OSHA's analysis of the economic feasibility of the PEL in the dry color formulator industry is not supported by substantial evidence because it is predicated upon faulty assumptions and flawed methodology.

---

3.  It is also worthy of note that one basis of reliance by OSHA is validly disputed by CPMA. CPMA asserts that the 30–day exclusion will be of no assistance to dry color formulator concerns, as the OSHA definition of a day will count as a full day any period in which there is any exposure to cadmium. We do not express any opinion as to the accuracy of this statement, or to the effect it may have on the analysis. However, it undoubtedly calls into question the analogy used by OSHA in that there is insufficient evidence to show that dry color formulators are so similar to other chemical mixers that the 30–day exclusion will be of any assistance to the industry.

### III. CONCLUSION

OSHA failed to develop and rely upon substantial evidence in determining that the PEL of 5 $\mu g/m^3$ was technologically and economically feasible for the dry color formulator industry, absent a SECAL. By using the category of chemical workers, some of whom work in industries with far different frequency and volume exposures to cadmium, OSHA relied on insufficiently similar grounds to adequately establish the pre-standard exposure levels for the existing domestic dry color formulator industry. The Hoechst Celanese and Rubbermaid case studies were also insufficiently similar to serve as a proper model. Therefore, the initial exposure levels not having been predicated upon substantial evidence, the remainder of OSHA's analysis in terms of the technological and economic feasibility of reducing the exposures to the PEL was flawed. Accordingly, we RE-MAND to OSHA for a specific inquiry into the technological and economic feasibility of the dry color formulator industry meeting the PEL and the possible need for a SECAL.